Thank you. May it please the court and counsel, I would like to reserve three minutes. I would like to address four issues with respect to this matter, and this is a case which deals with the non-dischargeability of a debt in a judgment against a Stan Visser. The first issue is the joining in so many respects of Stan Visser, who was Joe's father, even though their relationship was strained, they didn't get along, but also Stan Visser, was the Chief Operating Officer of Twin Falls Staffing, or actually Gem State Staffing, that had four companies. And the law is clear that you cannot impute the acts of one person to another in a non-dischargeability matter. One of the real complaints that existed in this case was the complaint that Stan Visser had in the year of 2008, the year that Joe Visser quit being at the company, had all these different parties, persons were employed at Gem State Staffing to sign contracts, employment contracts. They did not have non-compete clauses, and they did not have confidentiality clauses. They were done in Nampa, Boise, Twin Falls, and Idaho Falls. One of them was done by Joe Visser, and there was a complaint about that. They also complained with respect to the fact that the business, when Joe Visser left within a matter of a few days, went black. But what happened is Joe Visser gave his letter of resignation to the person who should have received it, namely his father, because he was the Chief Operating Officer. On a Wednesday, the company continued for Thursday and Friday. Other employees then found out about it and sought Joe Visser out to see if he decided to start up his own business, whether in fact they could work for him. And Stan Visser then decided to quit, and that's what made the company dark. They also made several allegations with respect to bad things that happened to the company. But once again, it's important to recognize that they have to be separate and apart from Joe Visser, and that there was a huge argument going on. The evidence in trial is pretty clear that the father and son were in this together. This was a cooperative endeavor between the two of them. I have trouble saying that the evidence doesn't support a conclusion that Stan was in on the deal with Joe, and they were very much aware of what each other was doing. Well, there's no question that the evidence is clear that Stan helped Joe Visser to start the new business. Well, not only start the business, but in fact violate the obligation to the other side. Well, and here's the issue that arises out of that, and the issue rises when Stan Visser drafts contracts, which he has all these people sign, which have a non-compete and do not have a non-compete clause, and also confidentiality, wasn't just Joe Visser. It was many others that signed the same contracts, and a big to-do was made about that that was in cahoots with Joe Visser. But isn't that just a jury argument, Mr. Robinson? Come on. I'm here on an abuse of discretion at best, clear error otherwise, about whether the bankruptcy court could come to the conclusion it did about whether your client was involved in doing what he had to do here, and all you're trying to do is parse the evidence. I mean, you're just parsing the evidence that you would have given to the jury, or you would have given to Judge Pappas in making your argument. He saw through it. He said no, and as Judge Fletcher suggests, he says, no, based on the evidence here, there's a problem, and this debt is dischargeable, or non-dischargeable. But what we have here, Your Honor, is that we have two actions resulting in two bankruptcies, one by Stan Visser, one by Joe Visser. I understand, and I will get to malicious. I mean, the bottom line is, when we're talking about non-dischargeability and we're talking about an abuse of discretion, we're talking about a guy who's the judge listening to the evidence and determining after listening to the witnesses in front of him whether it's non-dischargeable or whether it isn't. And he has a right, or as I understand it, the abuse of discretion gives him the opportunity to then make decisions as to who lies and who doesn't, who's telling the truth and who isn't, and therefore, on appeal, even if I don't agree, I can't undo it. And all you're doing is arguing the facts that would have been presented for your side. I understand that if it's a question of fact, it has to be a demonstration of clear error. My position is, and the argument I'm making is, that he did not look at the law, which indicated that there needed to be a separation, that you could not take the acts of Stan Visser. And you have to look at his capacity, being the chief operating officer. As Judge Fletcher tried to put to you, Judge Pappas was talking about what I saw, and it isn't the acts of Stan Visser, it's the coordinated acts of both Stan and Joe together that he suggested. Well, and I think that in doing so, I think that he took the action of Stan as if it's one and the same of Joe, and that his acts were included in Joe's acts, and that, according to law, cannot occur. That's my argument. I got the argument. Second argument, I do want to get to the willful malicious. I think that is significant. Obviously, they're separate and distinct. We know that with respect to the willful, we have to look at the subjective intent of Joe Visser. And that's important because Joe Visser indicates that he never signed a contract. Now, I recognize that the court found that there was a contract signed in the first instance, even though he was doing so as a sales manager. The interesting is, also, that then there's a second contract that's signed not just by Joe, but others, which obviously would be, even if there was a first contract, be controlled, because it's later in date, which would give rise to the subjective intent that Joe Visser would have. I'll call them the phony contracts. When you say the second contract, what are you referring to? Well, I'm not saying phony contracts. What are you referring to when you say second contract? I'm referring to the contracts which were executed. Tom Wellstead instructs Stan Visser to go out and get contracts signed, and he's to do so at all these different locations. These contracts, which are started in Nampa and Boise and then the Twin Falls and Otto Falls. These are the contracts in October 8, 2008-2009? They are the ones that were signed in 2008 in the spring and fall. The ones after the contract they'd originally entered into had been changed? We won't even say altered. Changed? Yes, but what... These are the contracts that don't contain the non-compete clause, in other words. That's correct. Okay, it took us a while to get there, but that's what I wanted to know. Yes, and those contracts would be controlling because it's just not Stan Visser acting and changing a contract with Joe Visser. He's doing so across the board with all of his employees. The court determined the purpose of all of that was an attempt to release the sons and employees from the agreement. Well, but the facts are... And a non-enforceable agreement. Having said... That's what the court said. I understand, but the court then did not take into consideration the contracts that were entered into with all those other parties. Is he somehow formulating this concept that he's doing it for all these others? I think we... Once again, Mr. Robinson, we're talking about abuse of discretion review here. Is there enough evidence in this record to sustain what Judge Pappas said? That the only reason for these altered agreements without informing Wellstead was to release the son and the employees from the agreement. And that's what Judge Pappas said after listening to all the evidence. That's what it was about. Right, it's son and employees. All the employees that went with him is what Judge Pappas is talking about. But there were now all these other employees and other locations. That's your good argument. But I'm saying now we're on abuse of discretion. Are there facts sustaining what Judge Pappas ruled? That's what we have to look at, not are there other facts that are contrary to it. I don't think that he really analyzed subjective intent is what I'm saying. Which is the element with respect to willful and with respect to the fact that in the mind of Joe Visser, he clearly believed that he had no non-compete clause. Well, that's his argument or that's testimony which Judge Pappas doesn't agree with. And he doesn't agree with it because Stan said, well, it's a computer glitch. Well, it was done to shorten the page. Well, it was a mistake that I was trying to prepare a non-compete and confidentiality agreement which was different than the regular employment agreement. Not that they ever signed it. Judge Pappas listened to everything, looked at the details and said, no. Use of discretion. I may even agree with you, Mr. Robinson, but I can't go against that. Well, but what you can do is analyze, for example, if he in fact did a proper analysis as to subjective intent because that's what it is. We're talking about merely a breach of a contract. That's dischargeable. We're talking about non-dischargeable. And we have to look at the subjective intent of Joe Visser. Tom Wellstead comes to Joe Visser and said there's a non-compete clause. What does he say? No, there isn't. And so his intent is clearly just demonstrated that that doesn't exist. Now, what about malicious? In the malicious, we have four parts. Wrongful act. I suppose we can argue that the wrongful act was he breached the contract to non-compete. But still, as I've mentioned before, what about the second contract? No doubt that he intentionally went out to compete. The third item is caused injury. And I'll get to that in just a minute as to what... Well, you better get there pretty fast because we're running down on time. Okay. And I will get to it quickly. And so the fourth one is, did he have just cause? They promised him that he would get something more because the Twin Falls staffing business did twice as better than the rest. And that never occurred, so he decided to leave the business. I think that was with just cause that he had the opportunity to do so. At least his argument or his testimony, which Judge Pappas did not believe. Now, this part I think clearly, and I recognize that it's probably also a factual determination, but I think there's clear error, and that's about damages. There was not sufficient damages, evidence with respect to this matter, that took this out of the realm of speculation. Why do I say that? Well, you know, the damages that were asked for were substantially reduced on the ground that maybe the high amount that was asked for was speculative. It seems to me that the amount awarded was... That's a pretty substantial reduction. And it seems to me that there's enough evidence to support the amount that Judge arrived at. First off, with respect to that, no expert. We merely have a report that's been developed by Tom Wellstead. Was it objected to? We admitted it into evidence, but we objected certainly to the factual information contained in such. In the document? Yes. There was a P&L statement before and a P&L statement after. And we clearly argued that, for example, what it did is merely looked at one past year. We also demonstrated and showed that that was a year when they had Walmart, $700,000 extra. It had a $200,000 extra for snow removal. In other words, it was an unusual year. You made that argument. We did, very much so. And the judge cut the estimate in half. He did so because here was the issue. Tom, Joe Bisser could have left the company and not gone out and competed and caused a significant loss in business just for the reason he was not there. And the court acknowledged that. Well, the trouble that I have, Mr. Robinson, you and I have both argued in front of the Supreme Court of Idaho, and the exact measure of damages in front of them is quite different. I mean, I look at Marsu v. Walt Disney. I was a defendant. I was always saying, get your damages down. But Marsu v. Walt Disney says, It is within the sound discretion of the trier fact to select the formula most appropriate to compensate the injured party. The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. The fact that the amount of damage may not be susceptible to exact proof or may be uncertain, contingent, or difficult of ascertainment does not bar recovery. I dealt with that throughout my practice. It doesn't say you've got to be very exact. But I think there's not sufficient facts. Well, that's a good argument. But again, when we're talking about damages, we're talking about abuse of discretion again. And with that wide open idea of how the trial court can determine that, you've got no real chance, or at least I never thought you did, in front of the Idaho Supreme Court when there's certainly one year period after the D left, the loss was $470,000, the loss profits were $230,000. That's what the bankruptcy court said. And going through the figures, you could come up with that. That's what I worried. Where's the plain error in light of what, because you're trying to, you concede, you lose, I think, if it's abuse of discretion. Plain error is the fact that, A, he merely took one year. That's all that's presented to him, not several years. And we faxed it, undermined that. And he merely cuts it in half, not because of the fact it's the previous year, but because Have you cited Idaho case law on that? Besides what Judge Smith read? I think we've cited other case law in our brief. You think? Yeah. Is there a plain error case that just leaps to mind in light of what Judge Smith said? I don't have one in front of me at this point. Okay. Well, maybe on Roboto you can find it. Okay. You know, let's do the following. You've used up all your time. There's also a cross-appeal here on attorney's fees. So we'll hear from the other side, both defending against what your arguments have been, allow that side to make the arguments if it wishes to do so on cross-appeal with respect to attorney's fees. So it will give you a chance to respond to that argument, as well as With respect to attorney's fees. With respect to attorney's fees, as well as rebuttal. And if need be, you can have a very short period for rebuttal on that. Thank you, Your Honor. Thank you. Good morning, Your Honors. My name is Ryan Dustin, along with James Holman, who is not present in the courtroom today. I represent Twin Falls Staffing, who is the plaintiff, appellee, and cross-appellant. We're here today to ask the court to affirm the district court's and the bankruptcy court's decision that Joe Visser's debt to Twin Falls Staffing is not dischargeable under 523A6, and that Joe Visser willfully, or by his willful and malicious conduct, caused damages in the amount of $230,000, in addition to the other damages. We're also here to ask the court to overturn the district court's decision concerning attorney's fees. Now, I'd like to address some of the arguments that counsel made, both in briefing, as well as in argument this morning, beginning with this argument of imputed liability. Twin Falls Staffing, the bankruptcy court, the district court, none of those parties is imputing any of Stan Visser's sins, for lack of a better term, to Joe Visser. Joe Visser did just fine all by himself. The bankruptcy court found that he solicited Twin Falls Staffing's temporary employees. The bankruptcy court found that he solicited Twin Falls Staffing's clients, and that he hired Twin Falls Staffing's internal staff, contrary to their contract, away from them. All three of those things constitute willful and malicious conduct, satisfying not only a breach of contract claim, but also various torts under Idaho law. So, I think that the imputation of liability isn't really at issue here. The second point is the matter of Joe's subjective intent, Mr. Visser's subjective intent. The bankruptcy court, and I'll refer your honors to 1272 to 1274 of Mr. Visser's excerpts of record, wherein the bankruptcy court found that Joe Visser knew, he repeatedly used words like knew, he appreciated, he realized. I don't think there's any doubt, as a matter of fact, there was no doubt in Judge Pappas' mind, that Joe Visser knew what he was doing, and knew the effects of what he was doing, and took those actions, those three actions that I just mentioned, with the intent to cause damage to Twin Falls Staffing. The third point I'd like to make is the defendant has argued in briefing that this was simply a matter of Mr. Visser outgrowing his job, wanting to go into business for himself, wanting to establish his own identity as a professional, if you will. If that truly were his intent, he could have done that. What would that have looked like? Well, that would have looked like Mr. Visser going down the street and hanging a shingle, calling it Magic Valley Staffing, and beginning his business. How long was the duration of the non-compete clause? It was one year. Yeah, so he'd have to go out and flip burgers for a year, but then he could set up. Well, even if he had gone out and breached his non-compete, and set up shop, and gone into the staffing business, that doesn't get us before the Ninth Circuit today. No, I understand that. That's a breach of his contract, but it's not willful and malicious conduct. When you say, all he's got to do is go set up an independent business, no, he's got a non-compete clause, and he's going to be in violation of that clause for a year. He would be. If he sets up immediately. So he's got to do something else for a year. He would be, and certainly, but if this were just a matter of him wanting to start his own staffing business, he could have done that, but he didn't just start his own staffing business. He took all these additional steps to ruin the business of his former employer, Twin Falls Staffing. Of course, when people leave a business where they've been an influence in the workplace, as he was, it's not uncommon for people to follow. It happens all the time in law firms these days. A partner goes out and takes a few associates, or fellow partners, or all of that. So that's not uncommon. The only barrier to doing that would be if there's a non-compete agreement, which is subject to lots of regulatory laws, certainly in California, as to how you can stifle potential competition like that. So the idea that he could have gone out and set up his own shop with new employees, presumably, and then only be a breach of contract. If he, on the other hand, thinks he doesn't have a non-compete, then why isn't he pretty much like the law firm example? But you can't infer motive, evil motive, malicious motive, from the fact that loyal subordinates in the mother company would, of their own volition, follow. But for the non-compete agreement, it's correct. You're assuming, as a fact, that there is a non-compete agreement. That's what he said. He could have done it, but he would have been in breach. And then malicious comes in because he took others. If the predicate in his mind, he didn't have a non-compete, he was just acting, put up his shingle, and then the employees who were loyal to him made their own decision. So I'm not sure you've proved malicious intent from the fact that other people followed. Well, the malicious intent is shown by the willful conduct and the fact that there was no just cause or excuse for the conduct. We can't create facts. The facts are that it was the policy and the strictly enforced policy of Twin Falls Staffing by Joe Visser's own father, Stan Visser, that every employee sign a non-compete agreement from the very get-go. We produced numerous documents at trial showing employment contracts with this non-compete agreement. Judge Pappas dealt with the fact that Stan Visser altered the contract, created the phony contract, and then went about distributing it among the employees. We don't know his purpose. We can guess as to his purpose. It might have been to provide camouflage for his intention of releasing Joe Visser. It might have been to take down Twin Falls Staffing. Well, the purpose jumps out at you. That is to say, so long as those employees are stuck with a non-compete clause, when Joe goes out to set up his own business, the employees can't follow. So he writes them a new contract that doesn't have a non-compete clause, which allows them to take them right away. It's obvious what's going on. You said you weren't imputing Stan Visser's conduct. Not for purposes of establishing willful conduct on the part of Joe Visser. But you just said it was Stan who revised the contract. That's correct. What did Joe have to do with that? Joe signed the contract. He signed the contract that he knew had been altered to remove the non-compete agreement. He also distributed that contract to the three employees, Amanda Plaster, Kevin Perry, and Michael Patterson. The case before the bankruptcy court was Joe knew that this was a deliberate change of policy on the part of Stan's past behavior. That's correct. So he wasn't clean hands in signing the new contract. And then he aided and abetted Stan, in effect, to his own benefit by distributing the revised contract to the people then who left with him. He aided and abetted himself. The counsel says, well, wait a minute. This revised contract went out to multiple offices, other employees. So what's your response to that? My response to that is it really matters very little why Stan had all these other employees sign the contract. Was it to provide cover for Joe Visser? Perhaps. Was it to set the stage to ultimately take down the other stores in Boise, in Napa, in Pocatello, in Idaho Falls, and essentially replace the Rocky Mountain Management, Gem State Staffing, and Twin Falls Staffing structure with Dutchman Services and Magic Valley Staffing? Perhaps. Okay. Why don't we move to the last issue, which you did lose, and now you're appealing. And I guess I'm trying to figure out what there is in Idaho law which would suggest to you that the bankruptcy court could put the attorney's fees and costs in the same action in as damages. The short answer is I couldn't find any Idaho law that allows Judge Pappas to put the attorney's fees in the award as damages. Oh, I couldn't either. In fact, it seems to me that if it were another action long ago that was undertaken and not a part of the bankruptcy, I might have a case. But this is the same case. This is the same case that was in front of the Twin Falls judge, or excuse me, I guess this was even the Sun Valley judge, instead of Pappas. But the only reason it didn't end there is because they went into bankruptcy and so it was brought as an adversary proceeding. So, frankly, I couldn't find why Judge Windmill was wrong. Well, here's my argument on that matter, and I'll agree. This attorney's fee situation is unusual, to say the least. As the court knows, Judge Pappas included the attorney's fees that Twin Falls Staffing incurred in state court prior to Joe Visser filing bankruptcy. Judge Pappas included those as part of Twin Falls Staffing's damages. The district court disagreed with that determination. And the district court did so based on the American rule and the corollary rule that the court is familiar with. Which Idaho operates under. Which Idaho operates under. The problem that I have with Judge Windmill's analysis is that Judge Windmill was looking at that $128,000 and analyzing those as though they were post-petition fees. All of the case law was looking at those as post-petition fees. These were pre-petition fees. What's wrong here is not the award of the fees, it's the procedure, the way we got there. I understand, but the problem is all that post-petition stuff and pre-petition stuff we've had in front of us, and we've even had argument about, on whether attorney's fees can be awarded and how they can be awarded. But I can't find anything, and frankly we cleared up, if attorney's fees are to be awarded, they're regarded as a category distinct from damages. That is AMS servicing versus Schwartz-Tollard. And I looked at all Jenkins versus Boise Cascade. I looked at Freeburger. I looked at every Idaho law I could, and I couldn't find a way to suggest that just because you start your action in state court, and then you go to your action in bankruptcy court, because the bankrupt takes you there, that you necessarily get the fees incurred in the state court action as damages in the bankruptcy court. And I don't think Idaho intends for it to be. I think you could have filed a motion, and maybe Judge Pappas could have said, you know, that's the same action, I'll give it to you. But I didn't find anything that says otherwise. Well, and we didn't feel it was necessary to file the motion because he already entered the judgment. It was already part of the judgment. I agree with you. I agree. And what I'm saying is that the district court, rather than taking the fees off the table, should have remanded to the bankruptcy court to walk through the proper procedural steps. Let me ask you this. Judge Pappas, I read Judge Pappas' order, of course, and he does award attorney's fees as part of damages. Had you asked for attorney's fees, or did he do this on his own? I'm trying to figure out whether this is, as it were, an invited error by you, and you were surprised, maybe? Why'd they get damages now? I was all set to make a motion, but he took it out of my hands. What happened? We didn't file a motion. There was evidence of the attorney's fees in Exhibit 182 and testimony by Tom Wellstead, but we did not file a motion because it was included as part of Twin Falls Staffing's damages. So you did ask for it as part of damages? You'd have to say you did because the exhibit included it. We did. So you just mischaracterized it. We mischaracterized it. So what we would ask the court to do is remand to step through the proper procedural hoops, file the affidavit, file the motion, go through all those things to comply with Idaho law, because I think under Idaho Code 12120, subparagraph 3, Jenkins v. Boise Cascade, that Judge Smith cited too, as well as Freiberger v. J.E.B. Engineers, as the prevailing party on the breach of contract claim, which is a state court claim. Twin Falls Staffing was clearly entitled to attorney's fees. Did you ask in front of Judge Windmill for a remand to the bankruptcy court so you could make a motion? No. In front of Judge Windmill, the argument was that the fees were incurred as mitigation. This is the first time you've asked for that kind of a remand? That's correct. I see my time's up. Are there any other questions? No, that's it. Thank you. Thank you, Your Honor. Why don't we put two minutes on the clock for rebuttal, and if you ask to respond on the attorney's fees, you may do so as part of that. May it please the Court of Counsel, the difficulty that Judge Windmill had is that we were seeking his compensatory damages. Exhibit 182 is the exhibit that deals with damages. It's the exhibit that, obviously, we're here to attack. It includes professional and attorney's fees to the tune of about $80,000. Judge Windmill, in his ruling, said, I've already taken that into consideration in ruling they don't get attorney's fees, but it was a duplication because the court gave attorney's fees as well as that. In addition, the exhibit 182 had replacing computer. The court found there was no evidence that Joe Visser did anything with respect to the computer, and therefore it was not his, and yet it was included. In that format of 182, Judge Pappas then merely took that format, and he divided it in one half. In addition to that, he never really addressed the fact that it was gross profits, namely, subtracted out only the expenses of the temporary people. No evidence that should have been considered. So do I have any authority to do as counsel wants me to do, which is remand this back to Judge Pappas to do it again? Yes. No, you do not at this point. He said yes. No, you do not. On damages, you think I do, but on attorney's fees, I don't. And why? We as lawyers walk an interesting tightrope, especially when a decision is partly in our favor and partly not. I mean, I guess I'm trying to figure out what is your good reason that on damages you think I should and on the attorney's fees I shouldn't. It's because the attorney's fees were treated as compensatory damages and as was determined by Judge Windmill correctly, that they weren't entitled to such as compensatory damages. It had to be attorney's fees looked at separate. That was never raised. And certainly there's not been a seeking of remand with respect to what's been done by Judge Windmill. And your case that I asked you for on plain air to contradict Judge Smith, have you come up with a site? I have not, Your Honor. Okay, thank you. Thank both sides for their arguments. Nice to have Idaho all represented, both up here and down there. Yeah, you thought you were very pleased with that being the case. Yeah, you were afraid you were getting out of Idaho, but you didn't. Okay, thank both sides. Twin Falls Staffing v. Visser, now submitted for decision.
judges: W. Fletcher, Fisher, N.R. Smith